# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

DAWUD J. BEST,         &ast;

   **Plaintiff,**      &ast;

v.              **Case No.: GJH-17-314**

             &ast;

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, *et al.*,      &ast;

   **Defendants.**     &ast;

             &ast;

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

## MEMORANDUM OPINION

Plaintiff Dawud J. Best filed this action on February 2, 2017 against Defendants Federal National Mortgage Association ("Fannie Mae"), Capital One, National Association ("Capital One") and Brock & Scott, PLLC ("B&S"), seeking damages for conduct surrounding attempts to collect on his mortgage debt. Plaintiff's Second Amended Complaint alleges violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 *et seq.*, the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.*, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 60. No hearing is necessary. *See* Loc. Rule 105.6. (D. Md.). For the following reasons, the Motion for Summary Judgment will be granted in part and denied in part.

# I.   BACKGROUND[1]

Plaintiff is the record owner of real property located at 5800 Carlyle Street, Cheverly, Maryland (the "Property"), where he has resided since January 1, 2008. ECF No. 68-2 ¶ 2; ECF No. 60-5 at 7.[2] On October 31, 2007, Plaintiff executed a promissory note (the "Note") with lender Chevy Chase Bank, F.S.B. ("Chevy Chase"), and received a loan of $335,000 secured by a deed of trust (the "Deed of Trust") encumbering the Property. ECF No. 60-3 at 10, 12, 14, 16; ECF No. 60-5 at 2; ECF No. 60-6; ECF No. 60-7. The Deed of Trust was recorded in the Prince George's County land records. ECF No. 60-7. On September 20, 2012, Chevy Chase assigned the Deed of Trust to Defendant Capital One. ECF No. 60-8. The assignment was also recorded in the Prince George's County records. *Id.*

Defendant Fannie Mae is the owner of Plaintiff's Note while Capital One is the servicer. ECF No. 68-20 at 2–4. Defendants maintain that Capital One mailed Plaintiff a notice of the transfer of servicing rights for the loan from Chevy Chase to Capital One in July 2009, though the copy of the notice Defendants have provided is marked "Representation of Printed Document" and "Internet Reprint." ECF No. 60-9. At his deposition, Plaintiff testified that he was never officially informed that Capital One had become the servicer of his loan, though he acknowledged that he had received statements from Capital One and returned the payments requested and that he "might have seen on TV" that Chevy Chase "was now Capital One." ECF No. 60-3 at 14–15. Plaintiff's monthly payments were "about $3,407." ECF No. 68-2 ¶ 4.

The last payment Plaintiff made towards the loan was for the month of March 2010. ECF No. 60-5 at 5. In a sworn declaration, Plaintiff states that he stopped paying Capital One "after it

---

[1] These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

failed to provide documentation that it qualified as the Noteholder as defined in my promissory note or as a holder of the note as defined under Maryland Code, Commercial Law Article, Section 1-201(21)." ECF No. 68-2 ¶ 6. On or about July 2, 2010, Plaintiff called Capital One to make a payment of $10,221 for April, May, and June 2010. *Id.* ¶ 8; *see also* ECF No. 60-16 at 2. The representative declined to accept the payment, however, claiming that Plaintiff was required to pay $14,381.14, which in addition to the $10,221 for the preceding three months included his July 2010 payment of $3,407 and $753.14 in late fees and other costs. ECF No. 68-2 ¶¶ 9–10, 12; ECF No. 60-16 at 2. Plaintiff believed that he only owed his normal monthly payments for April, May, June, and July and offered to pay that amount, which totaled $13,628, but the Capital One representative refused, insisting that he was required to pay the late fees as well. ECF No. 68-2 ¶¶ 11–14. Because Capital One had refused to accept the payment, Plaintiff believed that he had no obligation to continue making payments and that Capital One was not entitled to continue collecting interest, fees, and costs on the loan. ECF No. 60-16 at 2; *see also* ECF No. 60-3 at 23.

On August 20, 2010, law firm Samuel I. White, P.C. ("SIWPC") sent Plaintiff a letter stating that it had been instructed to initiate foreclosure proceedings on his loan and that "the creditor to whom the debt is owed is Capital One, N.A." ECF No. 60-10 at 2. The letter also informed Plaintiff that under the FDCPA, he was entitled to dispute the debt and request information about the loan within 30 days. *Id.* at 3. Over the next 15 months, Plaintiff sent three requests for information to SIWPC. *Id.* at 4–5. SIWPC responded with letters on September 17, 2010, July 19, 2011, and November 2, 2011, in which it provided information about the amount Plaintiff owed and confirmed that Chevy Chase was his original creditor. *Id.* at 4–10. The final

letter noted that SIWPC had forwarded Plaintiff's most recent request to Capital One to address any remaining issues. *Id.* at 10.[3]

On October 23, 2012, substitute trustees appointed by Capital One initiated a foreclosure proceeding in the Circuit Court for Prince George's County. *See Best v. Driscoll*, No. 0959, 2015 WL 5933669, at *1 (Md. App. June 18, 2015). On February 21, 2013, Plaintiff moved to stay and dismiss the foreclosure, asserting that Capital One was not the holder of the note and therefore could not appoint substitute trustees, among other claims. *Id.* at *2–*3. At a hearing on May 3, 2013, the court found that a document introduced by defendants was the original Note bearing Plaintiff's signature, that it was in Capital One's possession, and that the trustees and Capital One had standing to foreclose. *Id.* at *5. Accordingly, the court denied Plaintiff's stay motion and ruled that the foreclosure sale could proceed. *Id.* at *6. The Court also dismissed as untimely counterclaims that Plaintiff had filed alleging breach of contract and violations of the MCDCA and MCPA. *Id.*[4] The Maryland Court of Special Appeals found that the counterclaims were timely but affirmed the dismissal on June 28, 2015. *Id.* at *11.

Plaintiff then filed two lawsuits against SIWPC and Capital One in this Court. In the first action, filed on August 12, 2013, Plaintiff alleged that SIWPC violated the MCDCA by unlawfully threatening foreclosure and that both defendants violated RESPA by failing to act on requests he had sent with respect to his account. *See Best v. Samuel I. White, P.C.*, No. WDQ-13-2348, 2014 WL 2575771, at *1 (D. Md. June 6, 2014). The Court granted the defendants' motion to dismiss, holding that Plaintiff's inquiries did not trigger duties under RESPA and declining to

---

[3] SIWPC also sent a letter similar to the August 20, 2010 letter on October 20, 2011, informing Plaintiff that SIWPC had been instructed to initiate foreclosure proceedings on a debt owed to Capital One, N.A. ECF No. 68-3 at 2.
[4] In his counterclaims, Plaintiff asserted that Capital One had refused his request to provide him documentation establishing that it was the holder or owner of his Note and had unlawfully threatened foreclosure and made misleading statements in earlier correspondence, among other allegations. *Driscoll*, 2015 WL 5933669, at *1–*2.

exercise supplemental jurisdiction over the MCDCA claim. *Id.* at *2–*3. In the second action, filed on October 24, 2013, Plaintiff alleged that SIWPC and Capital One violated the FDCPA and the MCDCA by misrepresenting their ability to foreclose within a certain time period. *See Best v. Samuel I. White, P.C.*, No. WDQ-13-3164, 2014 WL 2002448, at *1 (May 14, 2014). The Court granted the defendants' motion to dismiss, concluding that the communications Plaintiff raised had complied with Maryland law. *Id.* at *2.

On October 13, 2015, another law firm, Cohn, Goldberg & Deutsch, LLC, sent Plaintiff a letter informing him that his loan had been referred to the firm for legal action based on his default. ECF No. 68-4. The letter stated that Fannie Mae was the current owner of the Note and that Capital One was the servicer. *Id.* On November 24, 2015, Capital One sent Plaintiff a Notice of Intent to Foreclose that identified Fannie Mae as the "Secured Party" and Capital One as the servicer. ECF No. 68-5 at 3, 5. On February 2, 2016, Defendant B&S, which holds a Maryland collection agency license issued on August 1, 2017, ECF No. 60-12 at 2, sent Plaintiff a letter stating "this account has been placed with our office for foreclosure," ECF No. 60-11 at 2. The letter informed Plaintiff that $464,376.55 was due at that time and that "the creditor to whom the debt is owed is Capital One, N.A." *Id.* B&S also informed Plaintiff that within 30 days, he could request verification of the debt and that B&S would provide him "with the name and address of the original creditor, if different from the current creditor." *Id.*

On February 29, 2016, Capital One appointed attorneys from B&S as substitute trustees under the Deed of Trust. ECF No. 60-13. On March 4, 2016, Plaintiff responded to B&S's February 2 letter to dispute the debt and the "letter's inference of a supposed default." ECF No. 60-14 at 2. Plaintiff also asked B&S to verify the alleged debt and to send him "all evidence proving" that he was "personally liable for the debt," that "Capital One, N.A. is the creditor,"

and that "the debt is owed to Capital One, N.A." *Id.* On March 8, 2016, the substitute trustees filed a foreclosure action in the Circuit Court for Prince George's County, Maryland. *BSPLLC v. Best*, No. CAEF16-07406 (Prince George's Cty. Cir. Ct.).[5]

B&S sent a letter to the Property on March 11, 2016 titled "Important Notice" and addressed "to all occupants" stating that a foreclosure action had been filed and that a sale of the Property "may occur at any time after 45 days from the date of this notice." ECF No. 60-15. On March 20, 2016, Plaintiff was served with the contents of the Order to Docket in the foreclosure action.[6] On July 7, 2016, Plaintiff sent a letter to Capital One disputing the delinquency of his account, recounting his willingness and ability to make a payment in July 2010, and asserting that because he had attempted to pay at that time he could not be considered to be in default on the loan. ECF No. 68-7 at 1. Plaintiff also asked Capital One to "identify the owner of the loan," to provide him a notice if the owner had changed as well as a "chain of ownership of the Note," and to "identify the date the Note was endorsed in blank." *Id.* at 2. On the same day, Plaintiff sent identical letters to the credit reporting agencies ("CRAs") Equifax, Experian, and TransUnion disputing that his Capital One account was delinquent. ECF No. 60-16 at 2–4. Similar to the Capital One letter, Plaintiff asserted that because Capital One refused to accept his July 2010 payment, it was not entitled to collect interest, fees, and costs after July 2010 and he should not be considered in default. *Id.*

In a report to Plaintiff dated July 27, 2016, Experian stated that it had conducted an investigation of the dispute Plaintiff had submitted and that the record for his Capital One

---

[5] The Court takes judicial notice of the docket in this case. *See Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 623 (D. Md. 2017).
[6] The Order to Docket is the filing that initiates a foreclosure action in Maryland state courts. *See Willis v. Bank of Am., N.A.*, No. ELH-13-2615, 2015 WL 5157501, at *3 n.12 (D. Md. Sept. 2, 2015). Though no document in the record reports the date the Order to Docket was served in this case, the date is alleged in Plaintiff's pleadings and listed by Defendants in their statement of undisputed facts. ECF No. 24-1 ¶¶ 19–20; ECF No. 60-1 at 11. The date also appears on the docket for the foreclosure action, of which the Court takes judicial notice.

account had been updated as a result of the dispute. ECF No. 68-17 at 1–3. The report showed a balance of $302,321 on the account and included a notation stating "[a]ccount previously in dispute - investigation complete, reported by data furnisher." *Id.* at 3. A TransUnion report issued the same day similarly stated that it had completed an investigation of Plaintiff's dispute and that new information about the Capital One account had been added. ECF No. 68-19 at 1. Like Experian's report, TransUnion's report showed a balance of $302,321 on the account and included a remark on Plaintiff's Capital One account stating "DISP INVG COMP-RPT BY GRNTR." *Id.* at 4. Finally, in a July 30, 2016 report, Equifax stated that it had "researched" Plaintiff's Capital One account, that "[a]dditional information has been provided from the original source regarding this item," that "[t]he status is reporting correctly," and that Capital One "has verified to OUR company that the balance is being reported correctly." ECF No. 60-17 at 5; *see also* ECF No. 68-15.[7]

B&S responded to Plaintiff's March 4, 2016 request for verification of his debt and other information on August 5, 2016. ECF No. 60-18. The letter attached copies of Plaintiff's Note, his Deed of Trust, and Chevy Chase's assignment of the Deed of Trust to Capital One on September 20, 2012. *Id.* On October 21, 2016, Plaintiff filed a Motion to Stay and/or Dismiss and Request for Discovery in B&S's foreclosure action. ECF No. 60-19. Plaintiff asserted that he was not in default on his loan and that Capital One was not the holder of his Note and therefore lacked authority to appoint substitute trustees. *Id.* at 2–4. The Circuit Court denied the motion by Order on November 22, 2016. ECF No. 60-20 at 2. On November 29, 2016, Plaintiff filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of Maryland. Voluntary

---

[7] Defendants have also submitted copies of CRA reports from October 2016 that include the same information about the results of the agencies' investigations. *See* ECF No. 60-17 at 2, 4.

Petition, *In re Dawud Best*, No. 16-25664 (Bankr. D. Md. Nov. 29, 2016) ("First Bankruptcy Case"), ECF No. 1.

On December 1, 2016, Plaintiff completed and sent to Capital One a Fannie Mae Uniform Borrower Assistance Form stating that he had no monthly income, savings, or investments, and had $475.00 in cash on hand. ECF No. 60-21; *see* ECF No. 60-22 at 3 (stating that the form was a loss mitigation application and was sent on December 1, 2016 and received by Capital One on December 5, 2016). According to Defendants, on December 27, 2016, Capital One sent Plaintiff a letter stating that it was unable to evaluate his application because further documentation was needed. ECF No. 60-23 at 2, 5. If Plaintiff did not send the information by January 11, 2017, the letter stated, the request for assistance would be closed for incompleteness. *Id.* at 2. In a declaration, Plaintiff asserts that he did not receive the letter. ECF No. 68-2 ¶ 24.

On December 30, 2016, Plaintiff sent a letter to Capital One titled "Qualified Written Request, Notice of Error and Request for Information." ECF No. 60-22 at 3. Plaintiff stated that he had not received a response to his December 1 application and asked for an explanation. *Id.* Plaintiff additionally stated that he sought "to notify Capital One of an error on this account and to request information regarding the loan." *Id.* Specifically, Capital One's records were "erroneous" in reflecting that Plaintiff had been delinquent on his loan since May 2010, when in fact he had tendered the full amount due in July 2010 but Capital One refused to accept it, instead demanding he pay more than the full amount. *Id.* Accordingly, late fees, collection fees, attorney fees, foreclosure-related costs, and other costs Capital One had assessed should be removed, Plaintiff asserted, as should interest assessed on the loan since July 2010. *Id.*

With respect to his "Request for Information," Plaintiff stated that he was "seeking to payoff this debt" and therefore needed certain information, including a certified copy of the Note

made directly from the original Note, a payoff statement, and a history of loan transactions. *Id.* at 3–4. Plaintiff also requested an explanation of why Capital One did not provide proof that it was the holder of the Note when Plaintiff requested it between May 2010 and January 2014. *Id.* Plaintiff asserted that Capital One's failure to fulfill that request was "another reason why Capital One did not receive payments during this time." *Id.* at 4. "[I]f Capital One failed to provide this information," Plaintiff concluded, "it was not the fault of me and I should not only be considered delinquent [sic] but all fees, interest and costs should be removed." *Id.* The same day, Plaintiff mailed another set of letters to the CRAs disputing the payment history, past due amount, and status of his Capital One account. ECF No. 68-13.

On January 13, 2017, Capital One sent Plaintiff a letter stating that his request for loss mitigation assistance was closed because his application was incomplete. ECF No. 60-24 at 2. Plaintiff responded with a letter to Capital One on January 26, 2017 in which he questioned the claim that his December 1, 2016 application was incomplete. ECF No. 68-9. According to the letter, Plaintiff spoke with a Capital One representative earlier that day who confirmed that a form Plaintiff had submitted was incomplete and that he failed to submit a second form. *Id.* Plaintiff insisted, however, that all required documents were completed and that the second form was not required to complete his application. *Id.* Plaintiff thus requested that his application be reopened or that Capital One send him the reasons supporting its decision to close it. *Id.*

Plaintiff also obtained updated reports from the CRAs in January 2017. On January 13, TransUnion issued a report stating that its investigation of Plaintiff's dispute was complete and that it had removed Plaintiff's Capital One account from its records. ECF No. 68-18 at 1–2. Equifax and Experian, however, showed no changes in their reports to their records of the account. ECF No. 68-14 at 1–2; ECF No. 68-16 at 3. On February 2, 2017, Plaintiff filed his

original Complaint in this action. ECF No. 1. On March 2, 2017, Capital One responded to

Plaintiff's January 13 letter. ECF No. 60-25. The letter stated that Capital One received an

incomplete loss mitigation application on December 27, 2016 and sent Plaintiff a letter informing

him that it was incomplete but did not receive the additional documentation requested and

therefore closed the application on January 13, 2017. *Id.* at 2. The letter also stated that Capital

One had received another incomplete application from Plaintiff on February 8, 2017 and had

informed Plaintiff that it was incomplete, but had not received the required documents to

complete the application and therefore closed it on February 28, 2017. *Id.*

Capital One also responded to other components of Plaintiff's letter. First, Capital One

explained that it had sent Plaintiff a notice on June 28, 2010 that his loan was in default, that it

could be cured only by paying $14,381.14 by July 28, 2010, and that only the total amount due

would be accepted. *Id.* The letter next stated that Capital One sent a Notice of Transfer of

Servicing Rights to Plaintiff on July 15, 2009 informing him that Capital One had acquired

Chevy Chase Bank and had become the servicer of his loan effective July 30, 2009. *Id.* at 3. The

letter asserted that Capital One "is the holder of your Note and the legal entity with the right to

collect payments from you." *Id.* Finally, in response to Plaintiff's request, the letter enclosed a

copy of Plaintiff's Note, a payoff statement, and a transaction history. *Id.*

On March 8, 2017, the Bankruptcy Court issued an Order of Discharge in Plaintiff's case,

granting a discharge under 11 U.S.C. § 727. First Bankruptcy Case (Mar. 8, 2017), ECF No. 45.

The court then issued a Final Decree closing the case. First Bankruptcy Case (Mar. 8, 2017),

ECF No. 46.[8] On March 10, 2017, Plaintiff asserts that he faxed an additional loan mitigation

application to Capital One. ECF No. 68-2 ¶ 26. According to Defendants, on March 20, Capital

---

[8] Plaintiff later successfully moved to reopen the case to file amended schedules, but the case was closed afterwards. *See* First Bankruptcy Case (July 5, 2017), ECF No. 66.

One sent a letter to Plaintiff informing him that an application he had submitted was incomplete because he had not provided a Homeowners Insurance Declaration. ECF No. 60-26 at 2, 5. In his declaration, Plaintiff asserts that he did not receive this letter. ECF No. 68-2 ¶ 29.

On April 17, 2017, B&S prepared a letter to Plaintiff enclosing a notice that the substitute trustees would hold a sale of the Property on April 27, 2017 at 3:00 PM. ECF No. 60-27 at 2–4. Plaintiff received the letter on or about April 20, 2017. ECF No. 68-2 ¶ 28. Using its USPS tracking number, Plaintiff determined that the letter was mailed on April 18, 2017. *Id.* (citing ECF No. 68-11). On April 24, Capital One sent Plaintiff a letter stating that Capital One had reviewed Plaintiff's submissions and that he was approved for a loan modification under which he could pay $2,060.60 monthly for a 480 month term. *Id.* Plaintiff was also conditionally approved for a short sale or mortgage release. ECF No. 68-10 at 2. Plaintiff believed that the letter was a response to his March 10, 2017 loss mitigation application. ECF No. 68-2 ¶ 27.

Defendants filed a Motion to Dismiss this action on April 18, 2017, ECF No. 14, to which Plaintiff responded on May 10, 2017 by filing a Motion for Leave to file an Amended Complaint, ECF No. 16. Plaintiff filed a Corrected First Amended Complaint on May 15 in which he revised his allegations and increased his damages demands. ECF No. 17. On May 26, 2017, Defendants filed a Motion to Strike the Corrected First Amended Complaint and to stay the action until the Court resolved concerns that non-attorney Thomas Alston had drafted Plaintiff's filings and engaged in the unauthorized practice of law. ECF No. 18. Plaintiff submitted an Opposition and moved for summary judgment against Defendants on June 14, 2017, ECF No. 19. On October 13, 2017, Plaintiff filed a Motion for Leave to Amend the Complaint to add facts about his bankruptcy filing. ECF No. 24 at 3.

On December 4, 2017, the Court held a hearing on the pending motions. ECF No. 30. In a Memorandum Opinion and an Order issued on December 21, 2017, the Court granted Plaintiff's Motion for Leave to file a Second Amended Complaint, denied Defendants' Motion to Strike and Stay, and denied the remaining motions as moot. ECF Nos. 31, 32. With respect to Alston, the Court expressed concern about significant evidence that Alston was involved in drafting Plaintiff's filings but could not conclude on the existing record that Alston engaged in the unauthorized practice of law. ECF No. 31 at 4.[9] Defendants filed an Answer to the Second Amended Complaint on January 18, 2018, and the parties entered discovery. ECF No. 34.

On August 9, 2018, Plaintiff filed a second Chapter 7 bankruptcy petition. Voluntary Petition, *In re Dawud Best*, No. 18-20533 (Bankr. D. Md. Aug. 9, 2018) ("Second Bankruptcy Case"), ECF No. 1. On October 4, 2018, however, the Bankruptcy Court dismissed the case for failure to file required documents. Second Bankruptcy Case, ECF No. 32. Plaintiff filed a third Chapter 7 petition on January 3, 2019, Voluntary Petition, *In re Dawud Best*, No. 19-10100 (Bankr. D. Md. Jan. 3, 2019) ("Third Bankruptcy Case"), ECF No. 1, but that case was also dismissed for failure to file documents the Court ordered Plaintiff to submit, Third Bankruptcy Case, ECF No. 16. On June 24, 2019, counsel for Plaintiff entered an appearance in this case. ECF No. 57. On September 13, 2019, Defendants filed a Motion for Summary Judgment. ECF No. 60. Following multiple extensions, Plaintiff filed an Opposition on October 21, 2019, ECF No. 66, but filed an amended brief and a motion for leave to file an amended opposition out of time on October 23, 2019, ECF Nos. 67, 68. In an Order issued on February 26, 2020, the Court

---

[9] In their Motion for Summary Judgment's statement of facts, Defendants explain that they deposed Alston and he testified that he may have assisted in the preparation of many of Plaintiff's filings and in development of his litigation strategy for this case. ECF No. 60-1 at 14–15 (citing ECF No. 60-4). While these admissions deepen the Court's previously stated concern about Alston's involvement in this case, Defendants do not raise Alston's conduct in their arguments in support of summary judgment. The Court therefore will not discuss the issue further.

granted the motion for leave and accepted the amended brief as the operative Opposition to the Motion for Summary Judgment. ECF No. 70.

## II.  STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

Plaintiff's Second Amended Complaint ("SAC") alleges claims under seven federal and state statutes. The Court considers each set of claims and allegations in turn.

## A. FDCPA Claims

Plaintiff's first count alleges that B&S violated the FDCPA in three communications: its February 2, 2016 letter to Plaintiff stating "this account has been placed with our office for foreclosure," ECF No. 60-11; its March 11, 2016 notice that a sale of the Property "may occur at any time after 45 days from the date of this notice," ECF No. 60-15; and its letter dated April 17, 2017 that a sale of the Property would be held on April 27, 2017, ECF No. 60-27. "The FDCPA protects consumers from 'abusive debt collection practices' by debt collectors." *Farber v. Brock & Scott, LLC*, No. TDC-16-0117, 2016 WL 5687042, at *5 (D. Md. Oct. 6, 2016) (quoting 15 U.S.C. § 1692(a)). A debt collector is "a person who 'regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'" *Id.* (quoting 15 U.S.C. § 1692a(6)).

### i. February 2, 2016 Letter

The parties first address B&S's February 2, 2016 letter to Plaintiff, which the SAC alleges violated several provisions of the FDCPA. Plaintiff first asserts that B&S violated 15 U.S.C. §§ 1692e(2) and 1692e(10) "by misrepresenting it had legal rights in the deed of trust for the Plaintiff property" before any B&S attorneys were appointed as substitute trustees. ECF No. 24-1 ¶ 46. B&S allegedly also violated "1692e" by "misrepresenting it could collect a debt when it was not licensed as a collection agency in the state of Maryland." *Id.* 15 U.S.C. § 1692e states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." The statute's subsections provide a non-exhaustive list of prohibited debt collector conduct. *See Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 585 (D. Md. 2013). § 1692e(2) bars "[t]he false representation of" either "(A) the character, amount, or legal status of any debt; or (B) any services rendered or

compensation which may be lawfully received by any debt collector for the collection of a debt." § 1692e(10) prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

"To state a claim for relief under any of these provisions of the FDCPA, Plaintiff must allege that '(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt [ ] collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Sterling*, 943 F. Supp. 2d at 585 (alteration in original) (quoting *Stewart v. Bierman*, 859 F. Supp. 2d 754, 759–60 (D. Md. 2012)). Defendants initially and correctly note that the SAC fails to explicitly allege that B&S is a debt collector and that the loan qualifies as consumer debt. ECF No. 60-1 at 17 n.6. The February 2 letter, however, states in a disclosure paragraph that "this communication is from a debt collector" and is "an attempt to collect on a debt." ECF No. 60-11 at 2. Courts have also held that a delinquency on a note secured by a deed of trust is a "consumer debt." *See, e.g.*, *Johnson v. BAC Home Loans Servicing, LP*, 867 F. Supp. 2d 766, 777 (W.D.N.C. 2011). Accordingly, the Court focuses, as the parties do, on whether B&S engaged in an act or omission that the FDCPA prohibits.

Defendants argue primarily that B&S did not represent in the February 2 letter that it "had legal rights in the deed of trust." ECF No. 60-1 at 19. Instead, Defendants argue, the letter merely made the true statement that the account had been "placed with our office for foreclosure." *Id.* at 20. Plaintiff contends that even a true statement is actionable under the FDCPA if it would be misleading under the applicable standard, which provides that "[w]hether a communication is false, misleading, or deceptive in violation of § 1692e is determined from the vantage of the 'least sophisticated consumer.'" *Russell v. Absolute Collection Servs., Inc.*, 763

F.3d 385, 394 (4th Cir. 2014) (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 136 (4th Cir. 1996)). The test is "an objective standard that evaluates § 1692e claims based upon how the least sophisticated consumer would interpret the allegedly offensive language." *Id.* at 394–95. Courts applying the standard "consider how a 'naive' consumer would interpret the statement," but "do not give credit to 'bizarre or idiosyncratic interpretations'; [courts] assume 'a quotient of reasonableness and . . . a basic level of understanding and willingness to read with care.'" *Elyazadi v. SunTrust Bank*, 780 F.3d 227, 234 (4th Cir. 2015) (quoting *Nat'l Fin. Servs., Inc.*, 98 F.3d at 136).

Plaintiff claims that the statement about placement of the account with B&S for foreclosure "could have easily mislead [sic] the least sophisticated consumer into believing B&S had legal rights to foreclose." ECF No. 68 at 14. Citing to the Maryland Rules, Plaintiff argues that the least sophisticated consumer would not only conclude from B&S's letter that it had legal rights to foreclose, but that by operation of law, it must also have "legal rights to enforce the power of sale clause in the deed of trust." *Id.* However, Plaintiff cites no authority for the proposition that the letter in fact compels those conclusions under Maryland law, nor that the least sophisticated consumer, or indeed any non-lawyer borrower, would make any conclusions of law from the letter whatsoever.[10] In short, Plaintiff attempts to manufacture a claim of deception by constructing a hypothetical consumer sufficiently versed in Maryland law to draw conclusions from the letter but not so well versed to interpret it properly. That fictional borrower bears little resemblance to the least sophisticated consumer standard.

---

[10] Plaintiff suggests that the statement would not have been misleading if it had omitted the phrase "for foreclosure." ECF No. 68 at 14. But it is not at all clear that "this account has been placed with our office" is less deceptive or misleading than the same statement with "for foreclosure" at the end. As Defendants note in their Reply, an unsophisticated consumer reading the shorter statement without any further explanation could reasonably be confused why he was receiving a letter from a law firm. ECF No. 71 at 8.

Further, even if there were a genuine dispute about whether the statement in the letter would mislead the least sophisticated consumer into believing that B&S could begin foreclosure immediately, a statement must also be "material" to be actionable under § 1692e. *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 126 (4th Cir. 2014). "The materiality requirement limits liability under the FDCPA to genuinely false or misleading statements that 'may frustrate a consumer's ability to intelligently choose his or her response.'" *Id.* (quoting *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir. 2010)). "Thus, only misstatements that are important in the sense that they could objectively affect the least sophisticated consumer's decisionmaking are actionable." *Id.* Plaintiff makes no attempt to argue that the least sophisticated consumer would proceed any differently if the language of the statement at issue were different. Summary judgment for Defendants is thus appropriate with respect to Plaintiff's § 1692e claim arising from the February 2 letter's statement about the B&S referral.

Defendants next challenge Plaintiff's allegation that B&S violated § 1692e by unlawfully representing that it could collect a debt without the appropriate Maryland license. Defendants do not claim that B&S held the appropriate license at the time the letter was sent, but rather argue that the Maryland Collection Agency Licensing Act ("MCALA"), Md. Code Ann., Bus. Reg. § 7-101, *et seq.*, exempts law firms from its requirement that debt collectors obtain state licenses.[11] Plaintiff challenges this claim without reference to any authority beyond the text of the statute, which states that the requirement does not apply to "a lawyer who is collecting a debt for a client, unless the lawyer has an employee who (i) is not a lawyer; and (ii) is engaged primarily to

---

[11] Neither party explicitly discusses the link between MCALA and the FDCPA, but courts in this District have repeatedly held that "[v]iolations of a state collection licensing law such as the MCALA may support a claim under the FDCPA." *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 519 (D. Md. 2013) (collecting cases).

solicit debts for collection or primarily makes contact with a debtor to collect or adjust a debt through a procedure identified with the operation of a collection agency." *Id.* § 7-102(b)(9).

While authority on this question appears limited, courts in this District have generally assumed that the exception applies to law firms as well as individual lawyers. On this basis, courts have found firms exempt from MCALA when plaintiffs fail to show that defendant firms are excepted from the lawyer exception by § 7-102(b)(i)–(ii) because they have non-lawyer employees engaged primarily in soliciting debts for collection or making contact with debtors. For example, Chief Judge Bredar recently found that because a plaintiff had not alleged facts indicating that a defendant firm had such non-lawyer employees, the firm was excluded from the MCALA's licensing requirement. *See Flowers v. Baltax*, No. JKB-19-0618, 2019 WL 3501584, at *7 (D. Md. Aug. 1, 2019).

In *Allen v. Silverman Theologou, LLP*, Judge Motz applied the same mode of analysis and concluded that the plaintiff had alleged adequate facts about the defendant firm's non-lawyer employees to proceed with a MCALA claim against it. No. JFM-14-3257, 2015 WL 2129698, at *3–*4 (May 6, 2015). Judge Motz found the case distinguishable from an earlier decision in which Judge Russell granted summary judgment to a defendant firm because there was no genuine issue of fact as to whether the activities of the firm's non-lawyer employee brought the firm within § 7-102(b)(ii). *Id.* (citing *Grant-Fletcher v. McMullen & Drury, P.A.*, 964 F. Supp. 2d 514, 527 (D. Md. 2013)). In this case, Plaintiff has failed to grapple with the relatively clear rule applied in these decisions and has presented no material in the record indicating that B&S has non-lawyer employees engaged in debt collection in a manner that could bring the firm

within MCALA's licensing requirement.[12] Summary judgment will therefore be granted to B&S with respect to this aspect of Plaintiff's FDCPA claims.

Plaintiff's final claim arising from the February 2 letter is that B&S violated 15 U.S.C. § 1692g "by failing to identify the creditor of the debt within five days of its initial communication to Plaintiff." ECF No. 24-1 ¶ 48. § 1692g(a), the provision on which Plaintiff appears to rely, states that "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication . . . send the consumer a written notice containing" several pieces of information, including "the name of the creditor to whom the debt is owed." 15 U.S.C. § 1692g(a)(2). Defendants first argue that the SAC fails to allege what the "initial communication" at issue was. ECF No. 60-1 at 21. While the pleading is somewhat vague, it is reasonably clear that Plaintiff intended to refer to the February 2 letter, and the Court will not reject Plaintiff's claim on that basis, particularly given that the SAC was filed *pro se*.

Defendants next argue that Plaintiff's claim fails as a matter of law because the "name of the creditor to whom the debt is owed" was identified in the February 2 letter when it stated that "[t]he name of the creditor to whom the debt is owed is Capital One, N.A." ECF No. 60-11 at 2.[13] Therefore, Defendants claim, no subsequent notice within five days was required. As Defendants recognize, however, the thrust of Plaintiff's claim is that Capital One is not truly Plaintiff's creditor and that it was therefore a violation of § 1692g(a)(2) to identify it as such, rather than Fannie Mae. Defendants make two arguments in response: that it was not a

---

[12] While the SAC makes conclusory allegations to this effect, ECF No. 24-1 ¶ 5, Plaintiff's subsequent filings do not address or substantiate them.

[13] The Court notes that Defendants later claim that the February 2 letter was *not* an "initial communication" subject to the requirements of § 1692g(a). ECF No. 60-1 at 28–29. Because the Court finds that argument unpersuasive, the Court need not further discuss that Defendant has taken contradictory positions on this issue.

misrepresentation to identify Capital One as the creditor, and that even if it was, it was not a material misrepresentation and therefore is not actionable.

In response, Plaintiff maintains that § 1692g(a)(2) requires the debt collector to identify not simply any creditor but rather the owner of the debtor's loan, which in this case is undisputedly Fannie Mae. ECF No. 68 at 5. In support, Plaintiff cites a decision from the Northern District of Georgia, *Sciortino v. Barrett Daffin Frappie Levin & Brock, LLP*, 9 F. Supp. 3d 1322 (N.D. Ga. 2013). The court there denied a motion to dismiss a § 1692g(a)(2) claim against a law firm whose initial communication to a debtor identified the servicer of the debtor's loan as the creditor rather than Fannie Mae, which the plaintiff had alleged was the actual owner of the loan. *Id.* at 1326, 1328. The court rejected the defendant firm's argument that the servicer was the plaintiff's creditor under the FDCPA's definition of that term, citing Eleventh Circuit case law directing courts to interpret the FDCPA broadly in light of its purposes. *Id.* at 1327.

Defendants rely on two cases from within this Circuit, pointing first to *Howes v. Wells Fargo Bank, N.A.*, in which Judge Hollander of this court drew on a Sixth Circuit decision about the definition of "creditor" under the FDCPA, as opposed to "debt collector," a mutually exclusive term. No. ELH-14-2814, 2015 WL 5836924, at *49 (D. Md. Sept. 30, 2015) (citing *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012)). *Howes* provides little direct guidance, however, because it concerned the proper classification of an entity that acquires a debt it did not originate, which is not the case with Capital One here. *See id.* Defendants accordingly rely primarily on *Giovia v. PHH Mortgage Corp.*, which more closely matches the facts here. No. 1:13cv00577 (LMB/TCB), 2013 WL 6039039 (E.D. Va. Nov. 13, 2013). In that case, plaintiff borrowers alleged that an initial communication from the defendant debt collector violated § 1692g(a)(2) by misidentifying the servicer of plaintiffs' loan as the creditor, even

though Fannie Mae was the owner of the loan. *Id.* at *6. As Defendants do here, the debt collector argued that by virtue of being the loan's servicer, it was also a creditor within the FDCPA's definition, and therefore was properly listed in the initial communication. *Id.*

The court in *Giovia* agreed and dismissed the plaintiffs' claim. *Id.* at *6–*7. The court began its analysis from the proposition that the plaintiff's servicer could either be a creditor or a debt collector under the FDCPA's definitions provision, 15 U.S.C. § 1692a, depending on when it acquired the servicing rights for the plaintiffs' loan. *Id.* at *6. Because the servicer had acquired its rights before the plaintiffs defaulted, it was a "creditor" under the terms of those definitions, the court found. *Id.* at *6. On the basis of that conclusion, the court in turn held that the initial communication's statement that the servicer was the creditor to whom plaintiffs owed the debt was not actionable. Although the court did not say so explicitly, it appears to have proceeded on the assumption that as long as an entity qualifies as a creditor, it does not violate § 1692g(a)(2) for a debt collector to name it as the creditor to whom the debt is owed. While the court noted plaintiffs' argument that simply because the servicer is a "creditor" does not make it the entity "to whom the debt is owed," the court did not address the argument in its analysis. *Id.* at *6 (internal quotation marks omitted).

Plaintiff argues, and the Court agrees, that *Giovia* did not squarely confront the question Plaintiff now presents: whether an initial communication or a letter within five days must identify not just any creditor but rather the owner of the debtor's loan. And the Court notes that other case law from outside this Circuit, in addition to *Sciortino*, supports Plaintiff's position. For example, in *Wheeler v. Codilis and Associates, P.C.*, a decision from the Northern District of Illinois, the court found that the plaintiffs had stated a claim under § 1692g(a)(2) because the defendant debt collector had identified the servicer of the plaintiffs' loan as the creditor to whom

the debt was owed rather than its alleged actual owner, the Federal Home Loan Mortgage Corporation. No. 13-cv-3093, 2013 WL 6632125, at *1, *3 (N.D. Ill. Dec. 16, 2013).

In light of the purposes of the FDCPA, the Court finds these cases persuasive. As the court noted in *Wheeler*, "[t]he text of § 1692g(a)(2) plainly requires identification of 'the creditor to whom the debt is owed,' regardless of whether that particular information might in some instances be less useful to a debtor than identification of the loan servicer or other entity." *Id.* at *3. Moreover, case law from this District stresses the importance of clarity in disclosing the creditor to whom a borrower owes a debt. In *Smith v. Cohn, Goldberg & Deustch, LLC*, Judge Bennett denied the defendant law firm's motion to dismiss a § 1692g(a)(2) claim based on language identifying in vague terms the originator of the plaintiff's loan, the current owner, and the current servicer. 296 F. Supp. 3d 754, 760–61 (D. Md. 2017). The court noted that "[t]hough the FDCPA does not necessarily require specific language to communicate the identity of the creditor to whom the debt is owed, such information 'must be conveyed effectively to the debtor.'" *Id.* (quoting *Miller v. Payco-Gen. Am. Credits, Inc.*, 943 F.2d 482, 484 (4th Cir. 1991)).

The court in *Smith* accordingly rejected the defendant's argument that the identity of the creditor to whom the plaintiff's debt was owed was effectively communicated merely because the owner of the debt was identified. *Id.* at 760. The court also noted the Seventh Circuit's decision in *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317 (7th Cir. 2016), which the parties also rely on here. The court there explained that "[t]o satisfy § 1692g(a), the debt collector's notice must state the required information clearly enough that the recipient is likely to understand it." 825 F.3d at 321 (internal quotation marks omitted). "To sum up our view of the merits," the court stated, "if the validation notice required under § 1692g(a)(2) does not identify the current creditor clearly and accurately, the law has been violated." *Id.* at 325.

Importantly, as Plaintiff notes, *Janetos* further held that a "plaintiff need not offer additional evidence of confusion or materiality to prove the violation." *Id.* In concluding that the statute does not include a materiality requirement, the court looked to the Fourth Circuit's decision in *Warren v. Sessoms & Rogers, P.A.*, in which the court declined to establish a materiality requirement for violations of § 1692e(11), which requires debt collectors to disclose their status as debt collectors, because the "statute expressly prohibits this exact *omission*." *Id.* at 324 (emphasis in original) (quoting 676 F.3d 365, 374 (4th Cir. 2012), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016)). While *Janetos* does not control the Court's decision here, its reasoning on the lack of a materiality requirement for § 1692g(a)(2) is persuasive, as is Judge Bennett's analysis in *Smith*. Therefore, because § 1692g(a)(2) requires a debt collector to disclose the creditor who is the owner of the borrower's debt, and B&S did not do so here, summary judgment is inappropriate with respect to Plaintiff's § 1692g(a) claim against B&S.[14]

### ii.    March 11, 2016 Notice to Occupants

Plaintiff's next set of FDCPA claims concern the March 11, 2016 letter that B&S sent to the Property, which both parties refer to as the "Notice to Occupants," stating that a foreclosure action had been filed against the Property and that a foreclosure sale could occur at any time after 45 days from the date of the notice. ECF No. 60-15. The SAC asserts that the Notice "violated 15 U.S.C. § 1692e(2), (5), (10), f(6) by misrepresenting [that B&S] could schedule a foreclosure sale of the Plaintiff's property before 45 days elapsed after B&S served the mortgagor with the foreclosure order to docket." ECF No. 24-1 ¶ 47. Defendants' primary

---

[14] Plaintiff's Opposition briefly asserts that B&S's failure to identify the true creditor was also misleading under § 1692e. ECF No. 68 at 13. Because Plaintiff did not make this claim in the SAC, and because the Court finds summary judgment inappropriate under Plaintiff's primary § 1692g(a) theory, the Court does not consider this argument further.

argument in support of summary judgment is that the Notice does not fall within the scope of the FDCPA because it was not a communication made in furtherance of the collection of a debt. ECF No. 60-1 at 24. Defendants also argue that the language at issue was required by state statute and therefore did not violate the FDCPA. *Id.*

The FDCPA's scoping provisions are contained in the introductory clauses of § 1692e and § 1692f, which state respectively that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," and that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." Underscoring the breadth of these provisions, the Fourth Circuit has explained that "nothing in this language *requires* that a debt collector's misrepresentation be made as part of an express demand for payment or even as part of an action designed to induce the debtor to pay." *Powell*, 782 F.3d at 123 (citing *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010)). Instead, "[t]o be actionable under these provisions of the FDCPA, a debt collector needs only to have used a prohibited practice *in connection with* the collection of any debt or in an *attempt* to collect any debt." *Id.* at 124 (internal quotation marks omitted); *see also In re Dubois*, 834 F.3d 522, 527 (4th Cir. 2016).

The plain message sent by the Fourth Circuit in describing the FDCPA's reach is that courts should consider it to be broad and expansive. In light of this direction, the Court has little difficulty concluding that the Notice to Occupants falls within the statute's scope. As Defendants themselves maintain, the letter was required under state law in order to proceed with foreclosure, which is of course a method of collecting on a debt. *See Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 376 (4th Cir. 2006), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019). And the Fourth Circuit's clear direction that the

communication need not be "part of an action designed to induce the debtor to pay" negates any concern that the Notice, which contains statements directed at renters of the property and does not address payment of a debt, is not regulated by the statute. *Powell*, 782 F.3d at 123.

Nor does the fact that state law required Defendants to send the Notice exempt it from the reach of the FDCPA. To be sure, Maryland law does require such a notice, and the March 11 letter does appear to have included the language the statute requires. *See* Md. Code Ann., Real Prop. § 7-105.11(b)(1). But "a debt collector must comply with the FDCPA while complying with a state foreclosure law," and defendants are not "exempt from the requirements of federal law simply because they attempted to comply with state law." *Goodrow v. Friedman & MacFayden, P.A.*, 788 F. Supp. 2d 464, 471 (E.D. Va. 2011); *see also Garner v. ClaimAssist, LLC*, No. ELH-16-1260, 2017 WL 1093276, at *11 (D. Md. Mar. 22, 2017) (rejecting an argument that the defendant debt collector's attempts to comply with Maryland law exempted it from FDCPA claims based on that conduct).

Notably, Defendants make no alternative argument conceding *arguendo* that the March 11 letter is subject to the FDCPA but claiming that it nonetheless was not unlawful. Plaintiff's claim is that the letter violated several of the prohibitions in § 1692e, as well as § 1692f, "by misrepresenting [that B&S could schedule a foreclosure sale of the Plaintiff's property before 45 days elapsed after B&S served the mortgagor with the foreclosure order to docket." ECF No. 24-1 ¶ 47. As Plaintiff correctly asserts, § 7-105.1(n) of the Real Property Article of the Maryland Code "prohibits foreclosure sales of residential property until 45 days after service of process of the foreclosure Order to Docket." *Cooke v. Carrington Mortg. Servs.*, No. TDC-18-0205, 2019 WL 3241128, at *3 (D. Md. July 18, 2019).

It is undisputed that Plaintiff was not served with the Order to Docket until March 20, 2016, nine days after the Notice to Occupants was sent informing residents of the Property that "[a] foreclosure sale of the property may occur at any time after 45 days from the date of this notice." ECF No. 60-15 at 2. A sale therefore could not lawfully take place until April 27, 2016, and accordingly the statement in the Notice misrepresented B&S's ability to foreclose. Addressing the same factual scenario, Judge Chasanow of this Court explained in *Cezair v. JPMorgan Chase Bank, N.A.*, that under the Maryland foreclosure statutory regime, "it appears that when *service* of the foreclosure order to docket is made, the notice to occupants should be made simultaneously," and not before. No. DKC 13-2928, 2014 WL 4295048, at *10 (D. Md. Aug. 29, 2014) (emphasis in original) (citing Md. Code Ann., Real Prop. § 7-105.1(h)(2)). Judge Chasanow accordingly found that if a statement that a foreclosure sale may occur after a certain date "is made before the legal right to do so exists, it can constitute a threat to act that is made with knowledge of the threat's illegality." *Id.*; *see also Estate of Morgan v. BWW Law Group, LLC*, No. CBD-18-170, 2019 WL 2869286, at *2 (D. Md. July 3, 2019) (citing *Cezair*).

While *Cezair* concerned a Maryland statute, § 1692e(5) prohibits debt collectors from making a "threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). In *Cooke v. Carrington Mortgage Services*, Judge Chuang found that the plaintiff had stated a claim under that provision because the defendant debt collector had sent her a notice stating that it could proceed to a foreclosure sale within 45 days when in fact the plaintiff was not served with the foreclosure Order to Docket until three months later. 2019 WL 3241128 at *3–*4. Accordingly, "[c]onducting a foreclosure sale immediately after this 45-day period elapsed was an action that could not 'legally be taken.'" *Id.* at *4 (quoting 15 U.S.C. §

1692e(5)). The same reasoning applies here with respect to the Notice to Occupants. Summary judgment is therefore inappropriate with respect to Plaintiff's claim under § 1692e(5).[15]

### iii. April 17, 2017 Notice of Sale

Plaintiff's final FDCPA claims arise from B&S's letter to Plaintiff ("Notice of Sale") stating that the Property would be sold at auction on April 27, 2017 and enclosing a Notice of Trustee's Sale. ECF No. 60-27 at 2–4. Plaintiff claims that the Notice violated § 1692e(5) in two ways: by providing notice of an impending foreclosure sale less than ten days before the sale, in violation of § 7-105.4(c)(2) of the Real Property Article,[16] which sets timing requirements for notices that must be sent prior to a sale;[17] and by violating a provision of RESPA's implementing regulations by scheduling a foreclosure sale despite receiving Plaintiff's complete loss mitigation application for his loan more than 37 days before the scheduled sale.

With respect to the first argument, the text of § 7-105.4 is clear. § 7-105.4(b) provides that "the person authorized to make a sale in an action to foreclose a mortgage or deed of trust shall give written notice of the proposed sale to . . . [t]he record owner of the property to be sold." § 7-105.4(c)(2) states that "[t]he notice . . . shall be sent not earlier than 30 days and not later than 10 days before the date of sale." The SAC alleges that the Notice of Sale here was not sent until April 18, 2017, only nine days before the scheduled sale, and therefore was untimely under the statute. In support of his claim, Plaintiff offers a printout of USPS tracking information for what he asserts was the package with the Notice of Sale. ECF No. 68-11. The document includes an entry dated April 18, 2017 stating "Pre-Shipment Info Sent to USPS, USPS Awaiting

---

[15] Although the SAC also asserted that the Notice to Occupants violated other subsections of § 1692e and § 1692f, Plaintiff does not address them in his Opposition. The Court therefore assumes that Plaintiff no longer intends to pursue claims on this basis.
[16] § 7-105.4 was previously numbered § 7-105.2, the citation that the parties use. *See* 2019 Md. Laws Ch. 93.
[17] Plaintiff also cites a Maryland procedural rule, Maryland Rule 14-210(b), that repeats the text of the statute.

Item." *Id.* at 2; *see also* ECF No. 68-2 ¶ 28. Plaintiff thus maintains that the Notice was not sent until April 18, only nine days before the scheduled sale.

Defendants argue first that because the Notice is dated April 17, 2017, it was within the statutorily acceptable range. As Plaintiff responds, however, accepting that argument would mean that debt collectors could satisfy their statutory timing requirements by sending notices one day before the foreclosure sale and simply backdating them, which cannot be correct. Defendants alternatively observe that the Maryland Court of Special Appeals has rejected the argument Plaintiff makes here. In *Ford v. Yacko*, the plaintiff borrower claimed that a notice of sale was sent nine days prior to a foreclosure sale, citing USPS tracking information that included identical language to the April 18 entry in the document Plaintiff offers here. No. 1006, Sept. Term, 2017, 2018 WL 4444981, at *3 (Md. App. Sept. 18, 2018). The court stated that "[t]he evidentiary value of this printout is unclear," and noted that the plaintiff "does not provide any support for the notion that the receipt of 'pre-shipment information' by USPS on April 5 necessarily forecloses the possibility that appellees mailed the notice on April 4.'" *Id.* The court was not persuaded "that the earliest the notice could have been 'sent' was on the date that it arrived at the USPS facility for delivery," particularly because, just as here, the plaintiff did not point to any authority concerning the meaning of "pre-shipment information." *Id.*

However, while this decision certainly casts doubt on the viability of Plaintiff's claim, it is not sufficient to award summary judgment to Defendants. The appellate court in *Ford* was reviewing the trial court's rejection of the plaintiff's attempt to vacate her foreclosure sale using a clearly erroneous standard of review. *Id.* at *1–*2. The Court here, in contrast, must determine whether there is a genuine dispute of material fact about whether Defendants' actions were unlawful. And the USPS tracking information is sufficient to raise a triable issue under the

applicable law. To challenge this conclusion, Defendants argue that the alleged violation was a "minor procedural irregularity" that "is not grounds to set aside a sale" under Maryland law. ECF No. 60-1 at 26. This argument misses the mark because Plaintiff is not seeking to set aside a foreclosure sale, but rather to obtain damages from Defendants under federal law for threatening to take an action that could not legally be taken. *See Farber*, 2016 WL 5867042, at *6. Defendants have thus failed to show that summary judgment is appropriate.

Plaintiff's RESPA-based argument proceeds under 12 C.F.R. § 1024.41, a provision of RESPA's implementing regulations, which are known as "Regulation X." *See Brown v. Select Portfolio Servicing, Inc.*, No. GJH-18-1664, 2019 WL 1958547, at *3 (D. Md. May 2, 2019). § 1024.41(c) provides that "if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application," the servicer "must evaluate the borrower for all loss mitigation options, provide the borrower with written notice of its options, if any, and notify the borrower in writing if its application has been rejected." *Cooke*, 2019 WL 3241128, at *4 (citing 12 C.F.R. § 1024.41(c)-(d)). "'[A] servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale' unless it has notified the borrower that the loss mitigation application was denied and the borrower has exhausted its appeal rights." *Id.* (alteration in original) (quoting 12 C.F.R. § 1024.41(g)).

Defendants argue that Plaintiff never submitted a complete loss mitigation application to Capital One and therefore was not subject to the protections of § 1024.41. The record supports Defendants' position. Plaintiff's declaration states that he submitted loss mitigation applications to Capital One on December 1, 2016 and March 10, 2017. ECF No. 68-2 ¶¶ 20, 26.[18] Contrary to

---

[18] The record indicates that Plaintiff also submitted an additional application on February 8, 2017, but Plaintiff does not raise that application in his pleadings or Opposition. *See* ECF No. 60-25.

Plaintiff's representation in his Opposition, however, the declaration does not assert that either application was complete. In fact, Plaintiff acknowledges that Capital One responded to the first application on January 13, 2017 stating that it had been closed because it was incomplete. *Id.* ¶¶ 23–24. Plaintiff states that he was frustrated because he felt he had provided the information required but does not assert that the application was complete. *Id.* ¶ 24. In a letter to Capital One on January 26, 2017, Plaintiff again asserted his belief that the application was complete, but acknowledged that a Capital One representative had informed him that it was not. ECF No. 68-9.

As for his March 10, 2017 application, Plaintiff has provided no documentary evidence of the fax that he asserts he sent. Notably, he denies receiving the March 20 letter from Capital One that Defendants have offered that acknowledges receipt of a recent incomplete application. ECF No. 68-2 ¶ 29; *see* ECF No. 60-26 at 2, 5. Instead, he simply states his belief that the letter from Capital One dated April 24, 2017, which he does not dispute receiving, was a response to a complete March 10 application. ECF No. 68-2 ¶ 27 (citing ECF No. 68-10). While that letter appears to approve Plaintiff for a loan modification, indicating that Capital One had received a completed application at some point, it does not describe or identify a specific application. ECF No. 68-10. Further, Plaintiff has only provided two pages of the letter, which are numbered "1 of 13" and "2 of 13." *See id.* In short, Plaintiff has offered no evidence beyond his own assumptions to support an inference that the letter was a response to a complete application submitted on March 10, nor any indications of his conduct or interactions with Capital One between that time and his receipt of the April letter.

In light of the lack of clarity in the evidence the parties have provided, the Court finds that the record is sufficiently ambiguous for a factfinder to reasonably conclude that Plaintiff submitted an application to Capital One on March 10, 2017. But for the reasons described,

Plaintiff has not offered sufficient evidence to raise a genuine dispute about whether he submitted a *complete* application at that time. Because RESPA requires a complete application for a lender's duties to be triggered, summary judgment will be granted to Defendants on the RESPA element of Plaintiff's FDCPA claim.[19]

### iv. Debt Verification Request

Though such a claim is not explicitly alleged in the SAC's FDCPA counts, Defendants also read the SAC to assert a claim against B&S under 15 U.S.C. § 1692g(b). That subsection provides that "in the event that the consumer disputes the debt or requests the name and address of the original creditor, the debt collector must 'cease collection of the debt' until the collection agency has provided the consumer with verification of the debt or acquiesced to the consumer's demand to provide the name and address of the original creditor." *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 635 (D. Md. 2014) (quoting 15 U.S.C. § 1692g(b)).The SAC raises Plaintiff's March 4, 2016 letter to B&S requesting verification of his debt, alleging that B&S continued its foreclosure efforts by filing the foreclosure action on March 8, mailing the Notice to Occupants on March 11, and serving Plaintiff with the Order to Docket on March 20, before finally responding in August 2016. ECF No. 24-1 ¶¶ 16–19.

Defendants argue that they had no obligation to verify Plaintiff's debt under § 1692g(b) because Plaintiff had previously sought verification of the debt from SIWPC. ECF No. 60-1 at 28–29. According to Defendants, the requirement to cease debt collection activity upon receiving a validation request only applies to borrower requests that follow an "initial communication" under § 1692g(a). Defendants argue that B&S's February 2, 2016 letter was not an initial

---

[19] Though Plaintiff makes several arguments in his Opposition claiming that he did not receive timely responses to his applications, those objections are not relevant to his RESPA-based FDCPA claim without a complete application.

communication for this purpose because SIWPC had previously validated Plaintiff's debt. In support of this position, Defendants cite a single case, *Senftle v. Landau*, in which Judge Messitte of this court held that "there is only one 'initial communication' with a debtor on a given debt under § 1692g(a), even though subsequent debt collectors may enter the picture." 390 F. Supp. 2d 463, 473 (D. Md. 2005).

As Plaintiff responds, however, many subsequent decisions have recognized but departed from *Senftle*, concluding that § 1692g applies to the initial communication from each successive debt collector. *See, e.g.*, *Tocco v. Real Time Resolutions, Inc.*, 48 F. Supp. 3d 535, 538–39 (S.D.N.Y. 2014) (collecting cases on both sides of the split that has emerged on this issue and concluding that the remedial purposes of the FDCPA should lead courts to construe the statute liberally in favor of debtors). The U.S. Court of Appeals for the Ninth Circuit notably reached this conclusion in *Hernandez v. Williams, Zinman & Parham PC*, holding that "the initial communication" refers "to the first communication by any debt collector." 829 F.3d 1068, 1078 (9th Cir. 2016). "This interpretation is the only one that is consistent with the rest of the statutory text and that avoids creating substantial loopholes around both § 1692g(a)'s validation notice requirement and § 1692g(b)'s debt verification requirement—loopholes that otherwise would undermine the very protections the statute provides." *Id.* (citing *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015)); *see also id.* at 1078–79 (finding this interpretation most consistent with the "FDCPA's declared purpose of protecting consumers from abusive debt collection practices").

Detailing the basis for its decision, the Ninth Circuit explained that "the remedial purpose of the FDCPA is furthered by giving consumers updated information about their debts and renewed opportunities to verify them as the debts change hands." 829 F.3d at 1079. In fact, "the likelihood that a debt collector will seek to collect from the wrong consumer or in the wrong

amount increases as the debt is resold." *Id.* With respect specifically to § 1692g(b), the court noted that interpreting the statute in the manner Defendants urge here would "restrict consumers to a single window of opportunity to halt collection efforts in order to verify their debts. That window would be of no assistance to a consumer who later suspects she is being improperly dunned by a misinformed successive collector." *Id.*[20] The Court finds this reasoning persuasive. Notably, though the Fourth Circuit has not addressed this specific question, it has relied on the "remedial nature of the FDCPA" to reach interpretations of the statute that favor debtors. *See, e.g.*, *Russell*, 763 F.3d at 392–93; *Miller*, 943 F.2d at 483–85. For these reasons, the Court respectfully departs from Judge Messitte's decision in *Senftle* and concludes that the thirty-day response requirement to a verification request under § 1692g(b) applies to B&S. Summary judgment is therefore inappropriate with respect to Plaintiff's verification claim.

## v. FDCPA Damages

Finally, Defendants argue that even if B&S committed violations of the FDCPA with respect to Plaintiff's loan, Plaintiff suffered no damages. "Debt collectors that violate the FDCPA are liable to the debtor for actual damages, costs, and reasonable attorney's fees." *Russell*, 763 F.3d at 389 (citing 15 U.S.C. § 1692k(a)(1), (a)(3)). Actual damages may include emotional damages, which though they "may be slight . . . are nonetheless viable." *Ademiluyi*, 929 F. Supp. 2d at 536. "The FDCPA also provides the potential for statutory damages up to $1,000 subject to the district court's discretion." *Russell*, 763 F.3d at 389 (citing 15 U.S.C. § 1692k(a)(2)(A)). The SAC asserts that Plaintiff is entitled to "$100 - $1,000" in statutory damages. ECF No. 24-1 at 15. "The FDCPA is a strict liability statute, meaning that a consumer need only prove one violation in order to establish liability." *Carroll v. Paul Law Office, PLLC*,

---

[20] "Dunning" is the demanding of payment from a delinquent debtor. *Dun*, Black's Law Dictionary (11th ed. 2019).

No. DKC 12-2041, 2013 WL 4008873, at *2 (D. Md. Aug. 2, 2013). Accordingly, because the Court has found that Plaintiff has raised a genuine dispute of material fact as to multiple alleged FDCPA violations, Plaintiff's claim for statutory damages may proceed.[21]

As for actual damages, the SAC asserts that due to B&S's violations of the FDCPA, Plaintiff suffered damages including "pecuniary expenses, fear, anxiety, frustration, anger and other emotional distress, which led to the manifestation of physical injuries, such as headaches, vomiting, night sweats, sleeping problems, depression, stomach sickness and vision difficulty," all of which were caused by B&S's conduct. ECF No. 24-1 ¶¶ 50, 52. Defendants argue that the record fails to substantiate these assertions or to link them to B&S alleged violations. With respect to pecuniary expenses, Plaintiff's Opposition asserts that he incurred costs preparing and filing documents for "the bankruptcies he filed to stop the illegal foreclosures." ECF No. 68 at 30. Plaintiff also asserts that his credit score was damaged as a result of the bankruptcy. *Id.* at 31. While Plaintiff cites out-of-circuit authority suggesting that these costs may be recoverable, mere assertions of fact in a brief without substantiation in the record are insufficient to raise a genuine dispute. *See Allen v. Dorchester County*, No. ELH-11-01936, 2013 WL 5442415, at *16 (D. Md. Sept. 30, 2013) (citing *EEOC v. CTI Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 914 (D. Md. 2011)). Plaintiff has not provided any record evidence of these alleged damages and they are accordingly insufficiently demonstrated to proceed past summary judgment.

Contesting Plaintiff's claim for emotional damages, Defendants point to Plaintiff's deposition testimony, in which he testified that he suffered "[i]nability to sleep," "vomiting," "sleepness nights, headaches, things of that nature." ECF No. 60-3 at 25. Plaintiff testified that "[t]his was more so early on in the litigation, around the time of filing the bankruptcy" and the

---

[21] The Court notes Plaintiff's arguments about the proper amount of statutory damages, ECF No. 68 at 32–34, but need not consider that question at this stage.

result of "receiving threatening letters and failure to respond to documents." *Id.* at 25–26. Plaintiff admitted that he had not seen a physician or mental health care provider for any of these issues but testified that he has taken Benadryl as a sleep aid as well as Pepto-Bismol and Pepcid AC, though he was unable to estimate a dollar amount that he had spent for these medications. *Id.* at 27–28. Defendants argue that this constitutes insufficient evidence of true emotional distress and that Plaintiff has failed to link the alleged harm to the alleged violations.

"The Fourth Circuit has not addressed what constitutes a sufficient showing of emotional distress as to warrant damages under the FDCPA." *Braden v. JH Portfolio Debt Equities, LLC*, No. DKC 19-1179, 2019 WL 6895544, at *2 (D. Md. Dec. 18, 2019). "The Fourth Circuit has, however, addressed that issue with regard to similar statutes," warning that emotional distress claims can be "fraught with vagueness and speculation." *Id.* (quoting *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007)). "[A] plaintiff's testimony can provide sufficient evidence to support an emotional distress award" if it rises above the level of "mere conclusory statements" and instead the plaintiff reasonably and "sufficiently articulate[s] true demonstrable emotional distress." *Id.* (internal quotation marks omitted) (second alteration in original) (quoting *Sloane*, 510 F.3d at 503).

While Plaintiff's evidence here only marginally exceeds that threshold, it is sufficient to proceed, even if the damages ultimately awarded would be minimal. *See Thomas v. Smith, Dean & Assocs.*, No. ELH-10-CV-3441, 2011 WL 2730787, at *4 (D. Md. July 12, 2011) ("awards for actual damages are minimal for emotional distress absent any indication that mental health treatment has been obtained or that the emotional distress has concretely affected a plaintiff's personal or professional life" (quoting *Ford v. Consigned Debts & Collections, Inc.*, No. 09–3102 (NLH)(AMD), 2010 WL 5392643, at *5 (D.N.J. Dec. 21, 2010)). Notably, in *Robinson v.*

*Equifax Information Services, LLC*, the Fourth Circuit affirmed an award of emotional damages to a plaintiff alleging that violations of her rights under the FCRA caused her "headaches, sleeplessness, skin acne, upset stomach, and hair loss." 560 F.3d 235, 241 (4th Cir. 2009).

Though the plaintiff's emotional harms in *Robinson* were significantly greater in degree than Plaintiff's here, *see id.*, they are sufficiently similar in kind for the Court to find Plaintiff's asserted damages adequate. *See Dorris v. Accounts Receivable Mgmt., Inc.*, No. GLR-11-3453, 2013 WL 1209629, at *8 (D. Md. Mar. 22, 2013) (noting that "there is no indication that medical corroboration is required to procure compensatory damages on the basis of emotional distress" for an FDCPA claim). And Plaintiff's testimony that his damages arose from "receiving threatening letters" and having to contend with B&S's "failure to respond to documents," while brief, is nonetheless sufficient to draw a causal link between the FDCPA violations alleged and his claimed harm. ECF No. 60-3 at 25–26. Further, Defendants' arguments challenging causation essentially amount to the claim that Plaintiff is responsible for his own harm because he had taken steps to frustrate earlier foreclosure efforts and developed anxiety awaiting responses to needless correspondence and requests. ECF No. 60-1 at 30–31. Defendants cite no authority suggesting that this argument should bear legal weight, however, and it is unclear why Plaintiff should be held solely responsible for emotional harm suffered due to Defendants' alleged violations of law, whatever their context. Because Plaintiff has adequately demonstrated damages, he may proceed with his otherwise meritorious FDCPA claims.

### B.  MCDCA and MCPA Claims

Plaintiff next alleges that B&S's conduct violated a provision of the MCDCA, Md. Code Ann., Com. Law § 14-202(8). "The MCDCA "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Sterling*, 943 F.

Supp. 2d at 596 (quoting *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *9 (D. Md. Jan. 22, 2013)). § 14-202(8) "provides that a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." *Id.* (quoting Md. Code Ann., Com. Law § 14-202(8)). Plaintiff also asserts that the same conduct by B&S violated the MCPA. That statute "prohibits 'unfair or deceptive trade practices,' Md. Code Ann., Com. Law § 13-301, and expressly designates as 'unfair or deceptive trade practices' those that constitute any violation of the MCDCA." *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 732 (D. Md. 2011) (citing Md. Code Ann., Com. Law § 13-301(14)(iii)); *see also Hawkins v. Kilberg*, 165 F. Supp. 3d 386, 390 (D. Md. 2016) (noting that "a violation of the MCDCA is a per se violation of the MCPA").

The SAC alleges that B&S violated § 14-202(8), as well as § 13-301(14)(iii), "by claiming a right to enforce the Deed of Trust when B&S knew it was not the trustee, not licensed to collect debts, and had no rights or interest in the Deed of Trust(s)"; and "by threatening to send a notice of foreclosure sale when B&S knew it could not schedule a foreclosure sale of the Plaintiff's property and for scheduling a foreclosure sale on April 27, 2017 – having known more than 37 days elapsed from Cap One's receipt of Plaintiff's loss mitigation application." ECF No. 24-1 ¶¶ 54–55, 58. As Plaintiff's Opposition states, "[t]hese allegations mirror Plaintiff's claims under the FDCPA," and Plaintiff accordingly argues that a genuine dispute exists as to whether B&S violated the MCDCA and MCPA "for the same reasons stated above." ECF No. 68 at 35.

Nowhere in the SAC, however, nor in his Opposition, does Plaintiff identify the specific communications in which B&S committed the alleged violations. Presumably, however, Plaintiff's allegations arise from the same communications as those discussed in the FDCPA claims. These claims will accordingly be disposed of in the same way. First, the Court assumes

that Plaintiff refers to B&S's February 2, 2016 letter in claiming that B&S improperly asserted rights to enforce the Deed of Trust and that it lacked the appropriate license. Summary judgment is warranted as to these aspects of Plaintiff's claim for the same reasons that it is appropriate for Plaintiff's FDCPA claims: the February 2 letter did not improperly claim rights to enforce the Deed of Trust and B&S is exempt from the Maryland licensing requirement.

It is less clear what conduct the SAC refers to when it alleges that B&S violated the MCDCA "by threatening to send a notice of foreclosure sale when B&S knew it could not schedule a foreclosure sale of the Plaintiff's property." ECF No. 24-1 ¶ 55. Plaintiff does not assert in other claims that B&S "threaten[ed] to send a notice of foreclosure sale" in any communication, nor does any such correspondence appear in the record. Plaintiff's Opposition does not clarify this ambiguity.[22] While Plaintiff could perhaps be vaguely referring to the March 11, 2016 Notice to Occupants alerting residents of the Property that a foreclosure sale could take place after 45 days, the Court will not read arguments and assertions into Plaintiff's filings that Plaintiff has not made. "The court's role is not to act as an advocate for the plaintiff and construct legal arguments on his behalf," especially now that Plaintiff has counsel. *Diallo v. Suntrust Bank Found. & Endowments*, No. 16-1312, 2017 WL 2840038, at *3 (D. Md. June 29, 2017) (quoting *Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002)).

The Court thus turns to Plaintiff's allegation that B&S scheduled a foreclosure sale on April 27 "having known more than 37 days elapsed from Cap One's receipt of Plaintiff's loss mitigation application." ECF No. 24-1 ¶ 55. This allegation presumably refers to Plaintiff's FDCPA claim under RESPA, which relies on the assertion that Plaintiff submitted a completed loss mitigation application to Capital One. The Court has already concluded that Plaintiff has

---

[22] In fact, Defendants' Motion ignores this allegation entirely and Plaintiff's Opposition takes no steps to reassert it.

failed to raise a genuine dispute that he submitted a complete application. Accordingly, summary judgment will be granted as to all of Plaintiff's MCDCA and MCPA claims. For that reason, the Court need not address Plaintiff's additional arguments that Capital One and Fannie Mae are vicariously liable for B&S's alleged MCDCA and MCPA violations. ECF No. 68 at 37–38.

### C. TILA Claim

Plaintiff's next claim alleges a violation of TILA by Capital One. "Congress passed TILA 'to assure a meaningful disclosure of credit terms' by 'mandat[ing] that creditors make specific disclosures before extending credit to consumers.'" *Sterling*, 943 F. Supp. 2d at 590 (alteration in original) (quoting *Jones v. Koons Automotive, Inc.*, 752 F. Supp. 2d 670, 682 (D. Md. 2010)). Plaintiff asserts that Capital One violated 15 U.S.C. § 1641(g)(1) "by failing to provide Plaintiff with notice of its acquisition of ownership" of Plaintiff's loan. ECF No. 24-1 ¶ 62. Under that provision, "parties assuming home loans, and thereby becoming new creditors, must disclose the assignment to the borrower in writing by a certain date." *Barr v. Flagstar Bank, F.S.B.*, No. RDB-13-2654, 2014 WL 4660799, at *2 (D. Md. Sept. 17, 2014). Plaintiff's claim is premised on his allegation that in its February 2, 2016 letter, B&S "claim[ed] that Cap One acquired the ownership of Plaintiff's loan." ECF No. 24-1 ¶ 61.[23]

Summary judgment will be granted for Defendants on this claim. It is apparent from the allegations, and from Plaintiff's arguments in opposition to summary judgment, that the claim is simply an attempt to exploit the ambiguity B&S created by referring to Capital One as the creditor to whom Plaintiff's debt is owed in the February 2, 2016 letter. In short, Plaintiff is well aware that Capital One is not the owner of his loan and has brought this claim to force Capital

---

[23] The SAC also alleges that in a filing in one of Plaintiff's bankruptcy cases, "B&S identified Cap One as the secured creditor of Plaintiff's loan." ECF No. 24-1 ¶ 61. Plaintiff does not raise the bankruptcy filing in his Opposition, however.

One to introduce evidence to that effect, which would strengthen Plaintiff's FDCPA claims against B&S. As Plaintiff freely states in his opposition, "[i]f Capital One provides proper evidence that Capital One did not acquire ownership of the debt, then Plaintiff will withdraw his TILA claim against Capital One." ECF No. 68 at 39. Because it is clear that this claim does not truly seek relief, and because the Court has already found summary judgment inappropriate with respect to B&S's representation about Capital One in the February 2 letter, summary judgment will be granted for Defendants on this claim.

### D. FCRA Claim

Count Four of the SAC alleges that Capital One violated the FCRA in interactions with the three CRAs. Plaintiff specifically asserts violations of 15 U.S.C. § 1681s-2(b), which "outlines the duties a furnisher of information has when given notice of a dispute concerning inaccurately reported information." *Alston v. Branch Banking & Tr. Co.*, No. GJH-15-3100, 2016 WL 4521651, at *6 (Aug. 26, 2016) (quoting *Alston v. Cavalry Portfolio Servs., LLC*, No. 8:12-CV-03589-AW, 2013 WL 665036, at *4 (D. Md. Feb. 22. 2013)). Under the statute, once a furnisher of information is given notice of a consumer's dispute as to the completeness or accuracy of any information provided to a CRA, the furnisher must:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of [Title 15 of the U.S. Code];
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly-- (i) modify that item of information; (ii) delete that item of

information; or (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1)(A)-(E). To bring a claim under § 1681s-2(b), "a plaintiff must establish three elements: (1) that he or she notified the [CRA] of the disputed information, (2) that the [CRA] notified the defendant furnisher of the dispute, and (3) that the furnisher then failed to investigate and modify the inaccurate information." *Alston*, 2016 WL 4521651, at *6 (alterations in original) (quoting *Cavalry Portfolio Servs.*, 2013 WL 665036, at *4).

The SAC asserts that Plaintiff repeatedly disputed the delinquency of his loan with Capital One and the CRAs, but that Capital One failed to instruct the CRAs to notate the account as disputed, and that the CRAs eventually removed the account from Plaintiff's reports because Capital One could not or would not furnish details about Plaintiff's account. ECF No. 24-1 ¶¶ 26–38. In the FCRA claim, Plaintiff asserts that Capital One violated the statute by "report[ing] varying information to the credit bureaus regarding Plaintiff's dispute," "fail[ing] to modify or delete the disputed account following the conclusion of a reasonable investigation," and "fail[ing] to make proper notations of Plaintiff's ongoing dispute and fail[ing] to report Plaintiff's mitigating factors – attempted [sic] to tender payment but Cap one refused on the basis of demanding more than was due on the loan – for not submitting payments." *Id.* ¶¶ 66–68.

The record reveals that Plaintiff's FCRA allegations stem from three underlying claims: that Capital One wrongly rejected Plaintiff's attempt to make a payment in July 2010; that as a result of the wrongful rejection, Plaintiff was relieved of any further obligations to repay his loan; and that Capital One was wrong to report Plaintiff's loan as delinquent to the CRAs. Proceeding from those assumptions, Plaintiff essentially argues in the FCRA claim that Capital One must not have done a proper investigation of his account when he sent letters disputing the delinquency to the CRAs in July and December 2016. *See* ECF Nos. 60-16, 68-13. If it had,

Plaintiff asserts, it would have discovered that Plaintiff was correct to dispute the amount Capital One demanded he pay in July 2010 and would or should have then notified the CRAs to strike the delinquency from his credit reports. Therefore, in order to proceed with his FCRA claim, Plaintiff must demonstrate a genuine dispute as to whether his obligations on the loan ceased after his disagreement with Capital One in July 2010. Otherwise, Capital One was correct to continue reporting Plaintiff's loan as delinquent to the CRAs, given Plaintiff's admission that the last payment he made was in March 2010. ECF No. 60-5 at 5.

To support his claim, Plaintiff relies primarily on Judge Hollander's decision in *Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623 (D. Md. 2012), which recounted her findings in an earlier decision in the same case, *Adam v. Wells Fargo Bank, N.A.*, No. ELH-09-2387, 2011 WL 3841547 (D. Md. Aug. 26, 2011). In that case, Wells Fargo had negotiated a loan modification with the plaintiff borrower but later returned his checks for two monthly payments, asserting that the modification had not been agreed to and that the plaintiff owed a greater amount than he had tried to pay. 901 F. Supp. 2d at 628–29. In assessing the plaintiff's breach of contract claim in her first opinion in the case, Judge Hollander held that, assuming the modification was a binding contract, Wells Fargo had indeed breached by refusing the plaintiff's tender of monthly payments. *See id.* at 629. As a result, Plaintiff was not required to continue tendering payments because Wells Fargo had made clear that doing so would be "futile." *Id.* at 630 (citing *Cochran v. Griffith Energy Serv., Inc.*, 993 A.2d 153, 166 (Md. App. 2010)).

Plaintiff relies entirely on that holding to support his position here. Plaintiff ignores, however, Judge Hollander's additional holding that assuming the loan modification was a valid contract, Wells Fargo's refusal of the plaintiff's tender "would not have had the effect of erasing his underlying mortgage debt to Wells Fargo." *Id.* "Rather, it would have had the effect of

terminating the accrual of additional interest for the period in question." *Id.* (citing *Cochran*, 993 A.2d at 168). In other words, even if Plaintiff here is correct that he was no longer required to tender payments to Capital One on a monthly basis after July 2010, his mortgage debt was not eliminated or forgiven. Moreover, Plaintiff's case is distinguishable from *Yacoubou*. Unlike in that case, in which the parties genuinely disputed the existence of an agreement governing the terms of repayment, Plaintiff has failed to raise a genuine dispute about whether the amount Capital One directed that he pay was incorrect.

In his declaration, Plaintiff concedes that he failed to make his monthly payments of $3,407 to Capital One for the months of April, May, and June 2010, totaling $10,221. ECF No. 68-2 ¶¶ 4, 6–7. Plaintiff asserts that he stopped paying because Capital One had refused to provide him documentation showing that it was the holder of his Note. *Id.* ¶ 6. Apparently that issue was cured or Plaintiff decided to abandon his objection, however, because Plaintiff called Capital One on July 2, 2010 prepared to pay the $10,221 that he owed. *Id.* ¶ 8; *see also* ECF No. 60-16 at 2.[24] The representative Plaintiff spoke with stated that he also had to make his $3,407 payment for July 2010, for a total of $13,628 in monthly payments, as well as $753.14 in "late fees and other costs," for a total payment of $14,381.14. ECF No. 68-2 ¶¶ 9–12. Plaintiff believed, however, that "the arrears for April, May, June and July was only $13,628" and on that basis refused to pay the full amount Capital One demanded. *Id.* ¶ 13. In other words, Plaintiff was prepared to pay all four monthly payments due but refused to pay the "late fees and other costs" that Capital One imposed because he did not believe that Capital One could require him to pay them. *Id.*

---

[24] Capital One's March 2, 2017 letter to Plaintiff, which Plaintiff cites in his Opposition, is consistent with the account in his declaration, explaining that on June 28, 2010, Capital One sent a letter to Plaintiff stating that his loan was in default and a payment of $14,381.14 must be received by July 28, 2010 to cure the default. *See* ECF No. 68 at 40 (citing ECF No. 60-25 at 2).

Nowhere in his filings does Plaintiff assert a legal basis for that belief, however. His Opposition simply reiterates that he "was willing to pay and offered to pay Capital One the amount of $13,628 to cover the claimed arrears." ECF No. 68 at 40 (citing ECF No. 68-2 ¶¶ 7–14). A brief review of Plaintiff's Note, however – of which the Circuit Court for Prince George's County found that Capital One was the holder in May 2013, *see Driscoll*, 2015 WL 5933669, at *5 – reveals that the note holder is entitled to collect a five percent fee on late payments. ECF No. 60-6 at 3. While Defendants have not explicitly identified the basis for the $753.14 in fees and costs that Capital One required Plaintiff to pay in 2010, it is plain that Capital One had at least some basis to impose late fees and that Plaintiff has identified no basis to object to them.

Having offered no evidence or grounds to support his claim that Capital One was not entitled to collect those fees and costs, Plaintiff lacks a valid objection to the amount Capital One required that he pay in July 2010 to cure the delinquency of his loan. Plaintiff therefore has failed to raise a genuine dispute of material fact about whether his decision to cease making payments to Capital One was proper. Accordingly, Plaintiff lacks any grounds to challenge Capital One's investigations of his disputes of his delinquency or the accuracy of the information that Capital One reported to the CRAs. The Court therefore need not address the accuracy of the accounts of investigations contained in the various credit reports that the parties have submitted, ECF Nos. 60-17, 68-14, 68-15, 68-16, 68-17, 68-18, 68-19, and summary judgment will be granted to Defendants on Plaintiff's FCRA claim.

### E. ECOA Claim

Plaintiff's fifth claim alleges that Defendants violated the ECOA, which among other purposes "establishes certain notification requirements that a creditor must satisfy." *Sterling*, 943 F. Supp. 2d at 593 (quoting *Piotrowski*, 2013 WL 247549, at *6). Plaintiff specifically claims

that Defendants violated 15 U.S.C. § 1691(d)(1), which provides that "within thirty days . . . after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." ECF No. 24-1 ¶ 81.[25] "[A] plaintiff states a claim under Subsection (d)(1) by alleging that a creditor 'failed to provide timely notice in response' to the plaintiff's application for credit." *Piotrowski*, 2013 WL 247549, at *7 (quoting *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC 10-3517, 2011 WL 3476994, at *16 (D. Md. Aug.8, 2011)).

Loan modification applications qualify as applications for credit for purposes of ECOA. *Bartlett v. Bank of Am, NA*, No. MJG-13-975, 2014 WL 3773711, at *4 (D. Md. July 29, 2014) (citing *Walton v. Wells Fargo Bank, N.A.*, No. AW-13-428, 2013 WL 3177888, at *6 (D. Md. June 21, 2013)). The SAC asserts that Plaintiff submitted loss mitigation applications on December 1, 2016 and March 10, 2017 but that Defendants did not respond and instead scheduled a foreclosure sale. ECF No. 24-1 ¶¶ 75–79. Plaintiff reiterates those assertions in his declaration, asserting that he never received a response to the December 1, 2016 application and only received a response to the March 10, 2017 application on or after April 25, 2017. ECF No. 68-2 ¶¶ 20–21, 26–27.

Defendants argue that only completed applications trigger creditors' duties under § 1691(d)(1) and that Plaintiff never submitted an application that was complete. ECF No. 60-1 at 42–43.[26] The Court has already agreed and concluded that Plaintiff has failed to raise a genuine dispute as to whether he ever submitted a complete application. As Plaintiff notes, however, courts have held that a provision of ECOA's implementing regulations, 12 C.F.R. §

---

[25] Plaintiff also alleges that Defendants violated a regulation implementing ECOA, 12 C.F.R. § 202.9(a)(1)(i), which reiterates the statute's requirement, stating that "[a] creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application."

[26] Defendants also argue that a creditor has no duties under § 1691(d) when a debtor is in default at the time of filing a loss mitigation application. ECF No. 60-1 at 42. Decisions of this Court have explicitly rejected this reasoning and held that a plaintiff in default may assert a claim under § 1691(d)(1). *See, e.g.*, *Piotrowski*, 2013 WL 247549, at *8.

202.9(c), requires a response within thirty days even to *incomplete* applications. That provision states that "[w]ithin 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either (i) [o]f action taken . . . or (ii) [o]f the incompleteness." 12 C.F.R. § 202.9(c)(1). "If additional information is needed from an applicant, the creditor shall send a written notice to the applicant . . . ." *Id.* § 202.9(c)(2); *see Kaswell v. Wells Fargo Bank, N.A.*, No. RDB-13-2315, 2014 WL 3889183, at *3 (D. Md. Aug. 6, 2014) (citing *Coulibaly*, 2011 WL 3476994, at *17) (rejecting the argument that the plaintiff's failure to allege that he submitted a complete application prohibited a § 1691(d)(1) claim in light of the requirements of § 202.9(c)).

While Plaintiff has failed to raise a genuine dispute that he submitted a *complete* application to Capital One, the assertions in his declaration that he submitted loss mitigation applications and that he did not receive responses from Capital One within the statutorily required period are sufficient to bar summary judgment for Defendants. A factfinder drawing all reasonable inferences in Plaintiff's favor could conclude that Capital One did not mail the letters that Defendants assert were timely responses to Plaintiff's applications. *See* ECF Nos. 60-23, 60-26. Notably, Defendants have submitted no affidavits or declarations from Capital One officials testifying to the preparation or sending of the letters, nor any other evidence beyond the purported documents themselves. Although this limitation in the record does not preclude summary judgment for Defendants on several of Plaintiff's other claims because they fail as a matter of law or do not rely on the documents Defendants have offered, Plaintiff has presented an adequate basis to bring his ECOA claim to a factfinder.[27]

---

[27] Plaintiff's Opposition asserts that both Capital One and Fannie Mae are liable under ECOA, but Plaintiff provides no factual or legal basis for ECOA liability for Fannie Mae. Accordingly, summary judgment will be granted to Fannie Mae on the ECOA claim. Further, because no other claims against Fannie Mae remain, Fannie Mae will be dismissed from this action.

### F. RESPA Claims

Plaintiff's final set of claims assert that Capital One violated 12 U.S.C. § 2605(e) and 12

U.S.C. § 2605(f), provisions of RESPA. § 2605(e), which the Court considers first, "imposes a

duty on loan servicers to respond to borrower inquiries and take certain actions with respect to

such inquiries." *Cole v. Fed. Nat'l Mortg. Ass'n*, No. GJH-15-3960, 2017 WL 623465, at *6

(citing 12 U.S.C. § 2605(e)). "Borrower inquiries triggering these duties are known as 'qualified

written requests' or QWRs." *Id.* The statute defines a QWR as

> a written correspondence, other than notice on a payment coupon or other
> payment medium supplied by the servicer, that--
> (i) includes, or otherwise enables the servicer to identify, the name and
> account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to
> the extent applicable, that the account is in error or provides sufficient
> detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

"If any servicer of a federally related mortgage loan receives a [QWR] from the borrower

. . . for information relating to the servicing of such loan, the servicer shall provide a written

response acknowledging receipt of the correspondence within 5 days (excluding legal public

holidays, Saturdays, and Sundays) unless the action requested is taken within such period." *Id.* §

2605(e)(1)(A). § 2605(e)(2) directs that within 30 days of receipt of a QWR, the servicer must:

> (A) make appropriate corrections in the account of the borrower, including
> the crediting of any late charges or penalties, and transmit to the borrower
> a written notification of such correction (which shall include the name and
> telephone number of a representative of the servicer who can provide
> assistance to the borrower);
> (B) after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes-- (i) to the extent applicable, a
> statement of the reasons for which the servicer believes the account of the
> borrower is correct as determined by the servicer; and (ii) the name and
> telephone number of an individual employed by, or the office or
> department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes-- (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

The SAC asserts that Plaintiff's December 30, 2016 letter to Capital One was a QWR and that Capital One failed to alert Plaintiff when it was received, violating § 2605(e)(1)(A), and failed to perform an investigation into the claims and disputes raised, violating all three paragraphs of § 2605(e)(2). ECF No. 24-1 ¶¶ 39–43, 85–87.[28] The letter, which is an exhibit to Defendants' Motion, stated that Plaintiff was writing for two reasons. ECF No. 60-22 at 3. First, Plaintiff sought "to notify Capital One of an error on [his] account," namely that Capital One's records that his loan was delinquent were wrong because Capital One had refused to accept his payment of the full amount that he owed in July 2010. *Id.* Plaintiff therefore demanded that all fees and interest assessed on his loan since that time be removed. *Id.* Second, Plaintiff stated that he was "seeking to payoff this debt" and requested a certified copy of his Note, which "should be signed and dated by a person who made the copy of the Note," a payoff statement, and a history of loan transactions. *Id.* at 2–3. Plaintiff also asked Capital One "to explain why it did not provide me with proof that it was the holder of the Note" when he requested that information between 2010 and 2014. *Id.* at 3.

---

[28] Plaintiff's Opposition asserts that his July 7, 2016 letter to Capital One was also a QWR that Capital One did not properly answer. ECF No. 68 at 49. However, while the SAC discusses that correspondence, it does not refer to it as a QWR. ECF No. 24-1 ¶¶ 26–27. In contrast, the pleading explicitly asserts that "[o]n December 30, 2016 Plaintiff sent a qualified written request ('QWR') to Cap One," demonstrating that Plaintiff was deliberately and knowledgably using specific terminology in the SAC, despite his *pro se* status. *Id.* ¶ 39; *see also id.* ¶¶ 40–43 (further discussing the "QWR"). Additionally, while the SAC alleges that Capital One responded to the letter, ECF No. 24-1 ¶ 29, no evidence in the record addresses the alleged response. Further, with an exception that appears to be a typographical error, the RESPA claims in the SAC refer to "Plaintiff's QWR" in the singular. ECF No. 24-1 ¶¶ 85–87. For these reasons, the Court will not consider RESPA claims arising from Plaintiff's July 7, 2016 letter.

48

Defendants argue first that the letter does not qualify as a QWR. ECF No. 60-1 at 43–44. "Courts have held that allegations and requests for documents that relate to the validity of the loan and do not attack the servicing of the loan are not QWRs under RESPA." *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249, 265 (D. Md. 2015) (citing *Ward v. Sec. Atl. Mortg. Elec. Registration Sys., Inc.*, 858 F. Supp. 2d 561, 574–75 (E.D.N.C. 2012)). The statute defines "servicing" as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3). In short, "servicing of the loan" concerns "receipt and application of payments." *Ayres*, 129 F. Supp. 3d at 265. Plaintiff's letter clearly falls within this definition because the error he raises concerns Capital One's alleged refusal to receive his payments and apply them to his loan balance.

Defendants next argue that summary judgment is appropriate because Plaintiff's claim of error in the QWR was "nonsense." ECF No. 60-1 at 44. While Plaintiff has set forth no legal basis for his claim that Capital One should not have refused his payment in July 2010, as the Court has already concluded, Defendants point to no authority stating that § 2605(e)'s obligations fall away if a borrower's claim of error lacks merit. Defendants thus appear to concede that Capital One violated § 2605(e)(1)(A) by failing to acknowledge receipt of Plaintiff's QWR within five days and § 2605(e)(2) by not taking action on the QWR within 30 days. ECF No. 68 at 50. Instead, Defendants claim that Plaintiff has not sufficiently demonstrated damages to proceed.

In response, Plaintiff claims that he suffered pecuniary damages "from the interest and fees that have been assessed on the account since July 2010." ECF No. 68 at 51. This assertion is

49

inadequate, both because Plaintiff has not set forth any evidence of the amounts of those costs and because he has failed to raise a genuine dispute about whether Capital One was correct to assess them after he ceased making payments in 2010. Plaintiff alternatively states that he "can put forth evidence of his emotional distress due to Capital One's failure to correct the account and to continue to try collect [sic] the illegal interest and fees assessed since July 2010." *Id.* Plaintiff's Opposition, however, is his opportunity to present any such evidence he may have and to explain how his damages flowed from Capital One's failure to respond to the QWR. *See Reynolds v. Ward*, No. TDC-18-3921, 2019 WL 3779755, at *6 (D. Md. Aug. 12, 2019) (citing *Ayres*, 129 F. Supp. 3d at 266). As the Court noted previously, a non-movant cannot defeat summary judgment through mere unsubstantiated assertions in a brief. Accordingly, summary judgment will be granted for Defendants on Plaintiff's claims under § 2605(e)(1) and (e)(2).

The SAC next asserts that Capital One violated 12 U.S.C. § 2605(e)(3) when it provided information to the CRAs within 60 days of receiving Plaintiff's QWR. ECF No. 24-1 ¶ 90. That provision states in relevant part that "[d]uring the 60-day period beginning on the date of the servicer's receipt from any borrower of a [QWR] relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or [QWR], to any consumer reporting agency." 12 U.S.C. § 2605(e)(3). Defendants argue that Plaintiff has offered no evidence that Capital One sent information to the CRAs during the relevant time period following his QWR. ECF No. 60-1 at 46. Alternatively, Defendants again assert that Plaintiff has failed to demonstrate any damages as a result of the alleged violation. *Id.* at 47.

Defendants are correct on both counts. In his Opposition, Plaintiff addresses Defendants' argument by citing a paragraph from his declaration. ECF No. 68 at 52 (citing ECF No. 68-2 ¶

50

34). In its entirety, that paragraph states that "I personally reviewed the dispute results from the CRAs and observed that there was no dispute notations on any of my credit reports." ECF No. 68-2 ¶ 34. The preceding paragraphs state that Plaintiff sent letters to the CRAs in July 2016 and March 2017 disputing the reporting of his Capital One account and that he received results indicating that Capital One had verified the information in the reports as accurate. *Id.* ¶¶ 32–33. Nowhere does the declaration describe requests to the CRAs or reports received in the period following Plaintiff's December 2016 QWR. Plaintiff's Opposition nonetheless cites the declaration to state that Plaintiff observed in Equifax and Experian reports that Capital One reported derogatory information on Plaintiff's account on January 31, 2017. ECF No. 60-1 at 47.

To be clear, Plaintiff's declaration attaches January 2017 reports from those agencies, both of which show Plaintiff's Capital One account as delinquent. ECF No. 68-14 at 1–2; ECF No. 68-16 at 3. But neither offers any indication that Capital One had provided information about the account since Plaintiff's QWR, particularly because the reports appear to be identical to July 2016 reports from those agencies that Plaintiff has also submitted. *See* ECF No. 68-15 at 1–2; ECF No. 68-17 at 2–3. Further, even if the January reports did raise a genuine dispute about whether Capital One provided information about the account during the relevant period, Plaintiff has no provided evidence of damages suffered as a result. Plaintiff's Opposition does not respond to Defendants' arguments on damages and none of Plaintiff's other arguments with respect to damages have bearing on his § 2605(e)(3) claim. Summary judgment for Defendants is therefore appropriate.

Plaintiff's final claims allege that Capital One violated 12 U.S.C. § 2605(f) by failing to notify Plaintiff that it received "his loss mitigation application" within five days of receipt and by "schedul[ing] a foreclosure sale while Plaintiff's loss mitigation application was pending." ECF

No. 24-1 ¶¶ 88–89. Plaintiff adds that "[m]ore than 37 days after its receipt of Plaintiff's loss mitigation application Cap One scheduled a foreclosure sale." *Id.* ¶ 89. § 2605(f) provides a private cause of action for borrowers to enforce violations of Regulation X. *See Robinson v. Nationstar Mortg. LLC*, No. TDC-14-3667, 2019 WL 4261696, at *5–6 (D. Md. Sept. 9, 2019). In his Opposition, Plaintiff reiterates his argument with respect to his RESPA-based FDCPA claim, asserting that he has raised a genuine dispute of material fact as to whether he submitted a completed loss mitigation application. As the Court has determined, however, Plaintiff has not done so. Because the only provisions of Regulation X that Plaintiff cites require Plaintiff to have submitted a complete application, summary judgment will be granted for Defendants on all of Plaintiff's RESPA claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment. Summary judgment for Defendants will be granted as to all of Plaintiff's MCDCA, MCPA, TILA, FCRA, and RESPA claims. With respect to Plaintiff's ECOA claim, summary judgment will be granted to Fannie Mae but denied as to Capital One. With respect to Plaintiff's FDCPA claims, summary judgment will be granted as to the claim under 15 U.S.C. § 1692e arising from B&S's February 2, 2016 letter; the claim that B&S violated the MCALA by unlawfully attempting to collect debts without a Maryland license; and the claim under § 1692e(5) that B&S's April 17, 2017 Notice of Sale violated RESPA regulations. Summary judgment will be denied as to the claim against B&S under 15 U.S.C. § 1692g(a) arising from the February 2, 2016 letter; the claim under § 1692e(5) arising from B&S's March 11, 2016 Notice to Occupants; the claim under § 1692e(5) that B&S's April 17, 2017 Notice of Sale was not sent ten days in advance of the scheduled foreclosure sale; and the

claim that B&S violated § 1692g(b) by failing to timely respond to Plaintiff's debt verification request. Additionally, because only claims against B&S and Capitol One remain, Defendants Capital One and Fannie Mae will be dismissed from this action. A separate Order shall issue.

Date: <u>March 30, 2020</u>                    /s/_____
                                              GEORGE J. HAZEL
                                              United States District Judge